**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** <br><br> v. <br><br> **MAURICE A. RIDLEY**, <br><br> Defendant. | Case No. 7:20-CR-29 (HL) |

**ORDER**

Before the Court is Defendant Maurice A. Ridley's Motion to Suppress Illegally Obtained Evidence and Derivative Custodial Statement.[1] (Doc. 33). This matter came before the Court for an evidentiary hearing on September 14, 2021. At the conclusion of the hearing, Defendant requested an opportunity to file a post-hearing brief following production of the hearing transcript. Both Defendant and the Government have now submitted their post-hearing briefs, and the motion is ripe for review. Upon consideration of the testimony and evidence produced during the hearing, the Court **DENIES** Defendant's Motion to Suppress.

**I.   BACKGROUND**

Captain Freddie Williams is a police officer with the City of Moultrie Police Department. (Doc. 40, p. 4). During his fourteen-year career with the Moultrie

---

[1] Defendant's motion to suppress states, "In the discovery provided to date, it does not appear that following his illegal arrest officers conducted a custodial interrogation of [Defendant], or that [Defendant] made any statements." (Doc. 33, p. 4). No evidence was introduced at the evidentiary hearing concerning any custodial statements. To the extent that Defendant still contends that any statements are subject to suppression, Defendant's motion is **DENIED**.

Police Department, Captain Williams has worked in patrol, investigations, narcotics, and crime suppression. (Id.).

On February 21, 2020, Captain Williams was a part of a concentrated patrol in northwest Moultrie. (Id. at p. 5). Captain Williams testified that the residential neighborhood was "crime riddled." (Id. at p. 5, 9). It is known as a drug area, and the Police Department frequently makes narcotics arrests and responds to calls concerning other violent crimes in the area. (Id. at p. 5, 9-10). On February 20, the officers were patrolling to gather information concerning two unsolved homicide cases. (Id. at. p. 5). Several agencies were involved in the patrol, including the Georgia Bureau of Investigation ("GBI"), narcotics investigators, and probation officers. (Id.).

Captain Williams was traveling in a black, unmarked, 2019 Dodge Ram pickup truck with a GBI agent, an investigator from the Moultrie Police Department, and a probation officer. (Id. at p. 6, 10). The truck has light bars affixed to the front and a blue light bar in the front and back windows of the truck. (Id. at p. 10-11). The officers each wore a bullet proof vest identifying them as law enforcement officers. (Id. at p. 6). They also carried their badges and firearms. (Id.).

Captain Williams was stopped at a stop sign when he saw a marked patrol car pass by Defendant Maurice Ridley, who was walking down the street. (Id. at p. 6, 11). Defendant stared at the patrol car as it passed. (Id. at p. 6, 11-12).

Williams found Defendant's conduct suspicious. (Id. at p. 12). Williams then observed Defendant pull what appeared to be a plastic bag from his pocket and throw it on the ground. (Id. at p. 6, 12). Based on his experience and his knowledge of the area, Williams immediately suspected that Defendant was discarding narcotics. (Id. at p. 6-7, 8, 12).

Captain Williams pulled his truck behind Defendant, opened the door, and called, "Hey, police, I need to talk to you." (Id. at p. 7). Defendant took off running. (Id.). Williams pursued. (Id.). As Williams chased Defendant across Second Avenue, he saw a gun fall from Defendant's person. (Id. at p. 7, 15). Williams continued his pursuit and did not stop to retrieve the firearm. (Id.). The officer followed Defendant through the backyard of a property, where Defendant scaled a fence. (Id.). Two narcotics officers apprehended Defendant and placed him under arrest. (Id. at p. 7).

Captain Williams informed the other officers that the gun needed to be recovered from the street. (Id. at p. 8). The gun, a High Point .380, was loaded and had an obliterated serial number. (Id.). The officers also recovered the plastic baggy Williams saw Defendant discard. (Id.). The bag contained marijuana residue. (Id. at p. 9, 18).

## II.  DISCUSSION

Defendant moves to suppress evidence of the gun recovered incident to his arrest. Defendant argues that law enforcement officers lacked reasonable

3

suspicion that he was engaged in criminal activity and that his subsequent arrest violated the Fourth Amendment.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. Not all interactions between police officers and private citizens, however, implicate the Fourth Amendment. See United States v. Jordan, 635 F.3d 1181, 1185 (11th Cir. 2011). In Terry v. Ohio, the Supreme Court held that it is consistent with the Fourth Amendment for an officer to conduct a brief, investigatory stop when the officer has reasonable, articulable suspicion that criminal activity is afoot. 392 U.S. 1, 30 (1968). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may [a court] conclude that a 'seizure' has occurred." Terry, 392 U.S. at 19 n.16. Courts recognize three different categories of police-citizen encounters requiring varying degrees of Fourth Amendment scrutiny: "(1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests." United States v. Perez, 443 F.3d 772, 777 (11th Cir. 2006).

Law enforcement officers' initial contact with Defendant arguably falls into the first category of encounters. Captain Williams testified that he called out to Defendant and said that he wanted to talk to him. "There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on

4

the streets." United States v. Franklin, 323 F.3d 1298, 1301 (11th Cir. 2003) (quotations omitted). Provided a reasonable person would feel free to terminate the encounter, then no seizure has occurred. Perez, 443 F.3d at 777-78. But, if the citizen's cooperation is induced by "coercive means," or if a reasonable person would not "feel free to terminate the encounter," then the interaction is no longer consensual, and a seizure has occurred, thereby implicating the individual's Fourth Amendment rights. See United States v. Drayton, 536 U.S. 194, 201 (2002).

There is no evidence here that the police officers engaged in any coercive action when they first encountered Defendant. They did not block Defendant's path; ask for identification; or display their weapons. See Perez, 443 F.3d at 778 (outlining factors a court should consider when determining whether a police-citizen encounter is consensual or whether a seizure has occurred). Captain Williams did nothing more than tell Defendant he wanted to talk to him. Defendant was well within his rights to ignore the police and to continue with his business. Florida v. Royer, 460 U.S. 491, 498 (1983); Florida v. Bostick, 501 U.S. 429, 437 (1991) (The "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure."). The fact that Defendant ran from the police is direct evidence that his freedom of movement was not restrained. "When a suspect flees from the police, he is not

submitting to their authority and therefore is not seized." Jordan, 635 F3d. at 1186 (citing California v. Hodari D., 499 U.S. 621, 626 (1991)).

Even if the Court were to determine that law enforcement officers' encounter with Defendant fell into the category of brief seizures and investigatory detentions, the totality of the circumstances demonstrates that the officers had reasonable suspicion for the stop. The Fourth Amendment does not prohibit a police officer "in appropriate circumstances and in an appropriate manner [from] approach[ing] a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." Terry, 392 U.S. at 22. An officer may seize a suspect for a brief investigatory stop where "(1) the officers have a reasonable suspicion that the suspect was involved in, or is about to be involved in, criminal activity, and (2) the stop 'was reasonably related in scope to the circumstances which justified the interference in the first place.'" Jordan, 635 F.3d at 1186 (quoting Terry, 392 U.S. at 19-20). The officer must "articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity." Illinois v. Wardlow, 528 U.S. 119, 124 (2000) (quoting Terry, 392 U.S. at 27).

Defendant argues that his presence in a known high-crime area, Captain Williams' observation of him discarding a plastic bag, and Defendant running from the police was not enough to establish reasonable suspicion. The Court disagrees. "An individual's presence in an area of expected criminal activity,

6

standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." Id. (citing Brown v. Texas, 443 U.S. 47, 52 (1979)). Nevertheless, the law does not require officers "to ignore the relevant characteristic of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." Id. Accordingly, the fact that a stop occurs in a "high crime area" may be a relevant factor in a Terry analysis. Id. (citing Adams v. Williams, 407 U.S. 143, 144 (1972)).

Here, the fact that officers encountered Defendant in a high crime area played a role in the officers' decision to engage Defendant but was not the exclusive reason for initiating the encounter. Captain Williams testified that he first became suspicious of Defendant when he observed Defendant staring at a patrol car as it drove passed. His suspicion grew when he saw Defendant throw a plastic baggy on the ground. It was at that point Captain Williams decided to stop and talk to Defendant. The decision to speak with Defendant did not constitute a seizure. It was not until Defendant decided to run that the officers made "the requisite show of authority necessary to trigger a Fourth Amendment seizure." Jordan, 635 F.3d at 1187 ("By the time the defendant was seized the officers plainly had reasonable suspicion to detain him."). "Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." Wardlow, 528 U.S. at 124. While there may be an innocent reason for flight from the police,

pursuit of the individual does not establish a violation of the Fourth Amendment. Id. at 125. Terry recognized that officers may detain an individual to resolve any ambiguity in the conduct precipitating the stop. Id. (citing Terry, 392 U.S. at 30).

The Court is satisfied based on the totality of the circumstances that law enforcement officers were justified in their suspicion that Defendant was engaged in criminal activity. The Court therefore concludes that there was no Fourth Amendment violation and **DENIES** Defendant's motion to suppress.

### III.   CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress Illegally Obtained Evidence and Derivative Custodial Statement. (Doc. 33) is **DENIED**.

**SO ORDERED**, this 29th day of December, 2021.

*s/ Hugh Lawson*
**HUGH LAWSON, SENIOR JUDGE**

aks